UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NANCY POWELL,                          )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )          Case No. 4:13-CV-2480 (CEJ)
                                       )
CAROLYN W. COLVIN, Acting              )
Commissioner of Social Security,       )
                                       )
          Defendant.                   )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 14, 2008, plaintiff Nancy Powell filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of March 14, 2010. (Tr. 184-87). After plaintiff's application was denied on initial consideration (Tr. 144-48), she requested a hearing from an Administrative Law Judge (ALJ). See 151-52 (acknowledging request for hearing). Plaintiff and counsel appeared for a video hearing on January 20, 2010. (Tr. 95-142). The ALJ issued a decision denying plaintiff's application on June 26, 2010 (Tr. 78-93), and the Appeals Council denied plaintiff's request for review on July 15, 2011. (Tr. 1-4).

Plaintiff sought review in this court, Powell v. Astrue, 4:11-CV-1340 (CEJ), and on August 6, 2012, the court remanded the matter, based upon the ALJ's misreading of an observation by a medical examiner and improper reliance on the opinion of a non-medical source. [Doc. #19]. On October 25, 2012, the Appeals Council remanded the matter to the ALJ. (Tr. 546). Plaintiff and counsel appeared for a second hearing on April 30, 2013. (Tr. 446-501). On October 10, 2013, the ALJ again denied

plaintiff's application. (Tr. 427-41). The ALJ's second decision stands as the commissioner's final decision.

## II. **Summary of Prior Medical Evidence**

In early 2007, plaintiff sought treatment from urgent care centers and emergency rooms for a variety of ailments, including bronchitis, laryngitis and pneumonia. (Tr. 254-59, 281-94). In June 2007, her primary care physician, Jesse D. Helton, D.O., treated plaintiff for complaints of depression, headache, and hypertension. (Tr. 330). He noted that plaintiff had not previously received treatment for these conditions. She was prescribed Clonidine for treatment of hypertension and anxiety and Prozac for treatment of depression.

In June and July 2007, plaintiff sought emergency treatment for injury to her right wrist. (Tr. 304-19; 246-50). X-rays in July 2007 were negative and plaintiff was discharged with instructions to take Ibuprofen or Tylenol. On July 30, 2007, plaintiff sought emergency treatment for a "sharp" headache that was sensitive to light, accompanied by nausea. (Tr. 295-303). She was observed to have a steady gait. She was treated with Ketorolac,[1] Compazine, and Benadryl and reported that her pain was almost fully relieved. (Tr. 299).

On August 4, 2007, plaintiff was diagnosed with pneumonia. (Tr. 281-94). On August 22, 2007, she was transported to the emergency room by ambulance with complaints of chest pain, which she rated at level 9 on a 10-point scale. (Tr. 263-80). She had been experiencing the pain sporadically for three weeks. Plaintiff reported that in the past she had been told that these symptoms might be due to her gall

---

[1]Ketorolac tromethamine, or Toradol, is "a nonsteroidal anti-inflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

bladder. (Tr. 273). An ultrasound of the abdomen revealed a normal liver, gallbladder, and pancreas, mild splenomegaly, and echogenic portions of the kidney raising a question of medullary sponge kidney. (Tr. 263). An EKG was normal. (Tr. 268). She was treated with Toradol and morphine and discharged. A few days later, Dr. Helton started her on a trial of Nexium. (Tr. 329).

In November 2007, plaintiff reported that she continued to experience periodic epigastric pain and that the Nexium did not help. (Tr. 328). Dr. Helton noted the presence of a soft-ball sized neurofibroma on her right lateral leg. Plaintiff, who weighed 197 pounds, complained that she was unable to lose weight. She was started on medication for weight loss and, at her next office visit in December 2007, she had lost 15 pounds. (Tr. 326). In January 2008, plaintiff reported that she had constant pain in her right shoulder that her chiropractor diagnosed a rotator cuff tear. (Tr. 326). On examination, Dr. Helton noted marked weakness and tenderness on palpation. He referred plaintiff for an MRI and told her to take Ibuprofen for pain.

She continued to complain of shoulder pain in February 2008. (Tr. 325). In March, plaintiff requested Topamax[2] for headaches. (Tr. 324). Dr. Helton diagnosed plaintiff with headache and essential hypertension and prescribed a trial of Inderal to treat both conditions. In April, plaintiff told Dr. Helton that she was not taking the Inderal every day as prescribed and again requested a prescription for Topomax. (Tr. 323). Her diagnoses on that day included migraine, malaise, hypersomnia, and essential hypertension. Plaintiff was given a trial of Topomax for headaches and was

---

[2]Topiramate, brand name Topamax, is an anticonvulsant that is used to prevent migraine headache but not to relieve the pain of migraines when they occur. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html (last visited on Jan. 13, 2015).

advised to take her Inderal daily to regulate her blood pressure.  In May 2008, plaintiff reported that she was doing well with her current medications.  (Tr. 334).  Dr. Helton noted the presence of neurofibromas on her face and extremities.

On May 12, 2008, Marsha Toll, Psy.D., completed a Psychiatric Review Technique.  (Tr. 335-45).  Dr. Toll concluded that plaintiff had a medically determinable diagnosis of depression but that her condition was not severe.  Plaintiff had mild difficulties in maintaining social functioning and concentration, persistence or pace.  Plaintiff's daily activities included caring for six children.  She indicated that she had experienced changes in her self care and that she found it difficult to leave home due to feeling depressed.  These claims were considered partially credible but, based on the totality of the evidence, plaintiff's impairment was not severe.

A nonexamining consultant completed a Physical Residual Functioning Capacity Assessment (PRFCA) on May 12, 2008.  (Tr. 346-51).  Based on a review of the medical records, the consultant determined that plaintiff can occasionally lift or carry 20 pounds and frequently carry 10 pounds.  She can sit, stand, or walk about 6 hours in an 8 hour day, and had no limitations in pushing or pulling.  The examiner noted that plaintiff claimed disability due to neurofibromatosis, high blood pressure, migraines, back problems, brown spots on the brain and a mass on her left leg.  The medical record included diagnoses for neurofibromatosis and morbid obesity.  With respect to plaintiff's migraine headaches, the examiner noted that her symptoms did not rise to "listing level," but plaintiff should nonetheless avoid exposure to environmental hazards and noise during migraines.  Plaintiff was also treated for high blood pressure, which had not resulted in end organ failure, but which necessitated a restriction on working at heights.  The medical record did not include ongoing

complaints of, or treatment for, back pain. Plaintiff's daily activities included caring for six children. She had difficulty with chores and shopping and was unable to watch a 2-hour movie because she could not stand or sit for a long period of time. These allegations were considered partially credible and would not preclude her from performing within the specified limitations.

In June 2008, plaintiff returned to the emergency room for treatment of a headache that had lasted three days. (Tr. 353-71). She reported dizziness, pain at the base of her skull, nausea and shortness of breath. She also reported seeing spots and having episodes of confusion during which she blacked out and became nonresponsive. A physical examination did not disclose any weakness, fever, or neurological deficits. A CT scan of her head was normal. (Tr. 369). Plaintiff was diagnosed with headache and vertigo and discharged with prescriptions for Meclizine[3] and Darvocet.

Plaintiff was seen at the emergency room in September 2008, with increased swelling in her right lower leg. (Tr. 372-87). On examination, there was pain on palpation and with walking, but no redness or warmth. She rated the pain at level 9 on a 10-point scale. She was diagnosed with cellulitis and discharged with a prescription for an antibiotic and Percocet.

On October 16, 2008, Stanley London, M.D., completed a consultative orthopedic evaluation of plaintiff. (Tr. 388-94). His report indicates that he did not review any records. Plaintiff's chief complaints involved pain in her back and right leg, with swelling that occasionally became black and blue. She described the pain as

---

[3]Meclizine is used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682548. html (last visited on Jan. 13, 2015).

sharp and stated that the pain in her leg was constant while the back pain came and went. She reported that she could walk for a block, and stand or sit for 20 minutes. On examination, Dr. London noted that plaintiff did not have true radiation of pain. He described a soft mass on plaintiff's lower right leg that was about 14 cm. across. She walked slowly and favored her right leg. She got on and off the examining table with difficulty. On a 5-point scale of muscle strength, with 5 indicating normal strength, plaintiff's lower right leg was rated at 4. (Tr. 392). However, she made only fair effort. Dr. London's clinical impressions were possible degenerative joint disease or disc disease and right leg post-trauma swelling and weakness with possible effusion or muscle tearing. Dr. London opined that plaintiff had a disability expected to last for 3 to 5 months. (Tr. 394).

Plaintiff was treated for laryngitis and strep throat in January 2009 (Tr. 402-07), and for pain in her clavicle in March 2009. (Tr. 408-12). In April 2009, she was diagnosed with bronchitis. (Tr. 413-16). In September 2009, she sought treatment for chronic pain in her left knee which had recently worsened. (Tr. 418-21). She had decreased range of motion and tenderness, without redness or swelling. X-rays were normal. Two days later she required treatment for a punctured ear drum. (Tr. 423).

### III. Additional Evidence Before the ALJ

#### A. New Medical Evidence

Plaintiff sought emergency treatment on November 10, 2009, for abdominal pain, which she rated at level 10 on a 10-point scale. (Tr. 693). The pain had begun 9 days earlier and was worsened by eating. (Tr. 694). She reported experiencing weakness and fatigue, nausea and vomiting, and abdominal tenderness. (Tr. 697-98). Her neuromusculoskeletal, cardiovascular, and respiratory functions were all within

normal limits. (Tr. 693). She had no pain or swelling in her extremities. Her diagnoses on discharge were urinary tract infection and probable gastroesophageal reflux disease. (Tr. 698).

On January 25, 2010, plaintiff was treated at an urgent care center for complaints of headache and low back pain. She did not have leg pain. (Tr. 687-88). She was diagnosed with sinusitis and low back pain. On February 26, 2010, she was treated for a urinary tract infection. (Tr. 684-85). On May 12, 2010, she sought treatment for anxiety, stating her husband had left her recently with 6 children to care for. (Tr. 680-82). She complained of poor sleep and decreased appetite; she denied experiencing chest pains, shortness of breath, and homicidal or suicidal ideation. She was given a prescription for Xanax to treat her anxiety.

Plaintiff sought emergency treatment for chest pain on August 20, 2010. (Tr. 672-78). She complained of constant pressure with intermittent sharp stabbing pain, worse with breathing. She rated the pain, which had been present for 4 days, at level 7 on a 10-point scale. With the exception of the pain, her physical condition was unremarkable and she was described as "smiling." (Tr. 676). At discharge, the physician noted that plaintiff "look[ed] very well" and wanted to go home. (Tr. 678). She was diagnosed with chest wall pain and hypertension. (Tr. 672).

On September 24, 2010, plaintiff again sought emergency treatment for a severe headache, cough, and insomnia. (Tr. 631-648). Plaintiff reported that she had had a chronic headache for three months. She denied chest pain, hearing loss, shortness of breath, nausea, vomiting, depression, and insomnia. She reported a history of neurofibromatosis, migraines, and attention deficit disorder. Her medications

included Vicodin and Propranolol.[4]  On examination, her cardiovascular system, respiration, and psychiatric status were all normal.  She had no edema or tenderness and had normal ranges of motion.  Fibromas were noted on her right ear, face, and leg.  A CT scan of her head was normal.  Her headache resolved in the emergency room.  (Tr. 636, 638).

On October 12, 2010, plaintiff sought treatment at an urgent care center for a headache.  (Tr. 668-70).  She reported that she had had a migraine for five days that had worsened in the previous six hours.  Usually, her pain resolved with Vicodin.  She had eye pain, body aches, vomiting, nausea, and sensitivity to light and sound.  She reported improvement after treatment with Toradol and Zofran.[5]  She was discharged with a prescription for the antidepressant Amitriptyline and told to follow up with her primary care physician.

Plaintiff returned to the urgent care center on February 11, 2011, with a severe cough that caused chest and back pain.  (Tr. 664-66).  She was diagnosed with bronchitis and given an antibiotic.  On April 5, 2011, she returned with an abscessed tooth, a headache and dizziness.  (Tr. 660-62).  She was treated with Toradol and given prescriptions for an antibiotic, an anti-inflammatory, and Ultram.[6] She returned a few hours later with a temperature of 101 degrees.  (Tr. 655-58).  She was

---

[4]Propranolol, or Inderal, is used to treat, *inter alia*, high blood pressure and migraine headaches.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682607.html (last visited May 13, 2014).

[5]Zofran, or Ondansetron, is used to prevent nausea and vomiting caused by cancer chemotherapy, radiation therapy, and surgery.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601209.html (last visited Jan. 13, 2015).

[6]Ultram is a centrally-acting synthetic opioid indicated for management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of pain for extended periods of time.  See Phys. Desk. Ref. 2428-29 (63rd ed. 2009) (discussing extended release product).

prescribed a different antibiotic and was told to follow up with a dentist as soon as possible. Also on April 5, 2011, plaintiff was notified that she was eligible for medical insurance through Missouri Health Net. (Tr. 649-52).

Plaintiff returned to see Dr. Helton on April 8, 2011.[7] (Tr. 810-11). He noted that plaintiff had been without insurance or medication for years. He described her as looking well and in no apparent distress. She had tenderness and swelling of the right jaw. He restarted her prescription for Inderal, and added hydrochlorothiazide (HCTZ) for treatment of blood pressure and Vicodin for pain. He instructed her to see a dentist as soon as possible.

On April 30, 2011, a CT scan of the head was completed after she complained of pain after a fall. The results were unremarkable. (Tr. 815).

At an office visit on May 11, 2011, plaintiff told Dr. Helton that she was doing well on her current medications and had no new complaints. (Tr. 808-09). She was eating and sleeping well. Lab results indicated mild anemia but were otherwise normal. Dr. Helton continued her prescriptions for Inderal and HCTZ and scheduled her for follow up in four months. On July 18, 2011, plaintiff was treated for strep throat. She still had a broken tooth. (Tr. 807). On August 26, 2011, plaintiff presented with complaints of ear pain, and frequent heartburn with pain that radiated into her back. (Tr. 805-06). She reported that Ranitidine[8] controlled her heartburn, but she did not take it every day. On examination, she was not in apparent distress and appeared well.

---

[7]According to the medical record, plaintiff had last been seen at Dr. Helton's office in April 2008. (Tr. 322-23).

[8]Zantac, or Ranitidine, is indicated in treatment of duodenal ulcer, GERD, and erosive esophagitis. See Phys. Desk. Ref. 1633-35 (65th ed. 2011).

She was diagnosed with sinusitis and was instructed to take Ranitidine twice a day. Her other medications included an antibiotic, HCTZ, Inderal, and Vicodin.

On September 18, 2011, plaintiff went to the emergency room with elevated blood pressure. (Tr. 700-20). She reported that she had weakness, numbing, and tingling in her right arm and face; a headache; anxiety; and was seeing spots. She said that she was under a lot of stress and that her husband had left her the night before this episode. (Tr. 707). On examination, it was noted that she was oriented, was not in distress or agitated, and her mood and affect were normal. Her coordination and gait were normal, but she had "slight [right] arm drift." (Tr. 702). All diagnostic tests, including scans of the brain, were negative, (Tr. 702-03, 710, 714), and the physician ruled out stroke and tumors of the central nervous system as a cause of her symptoms. (Tr. 715). At discharge, she had some weakness on the right side, but her symptoms were improving. (Tr. 711, 715). She was prescribed Ativan to treat her anxiety.

On November 15, 2011, plaintiff told Dr. Helton that she was doing well. (Tr. 803-04). She said she had gained a lot of weight since her husband left. On examination, she was in no apparent distress and appeared well. Dr. Helton prescribed Adipex for weight loss, in addition to plaintiff's usual medications. On December 9, 2011, she was given an antibiotic to treat a urinary tract infection. (Tr. 802).

Plaintiff received mental health services from Community Treatment, Inc. (Comtrea).[9] On January 3, 2012, she told counselor Jennifer Eisold, MA, that her

_____

[9]The administrative record contains treatment notes from Comtrea starting on January 3, 2012. It appears that her treatment there began at an earlier date. See Tr. 795 ("Clt reported 'I was doing better since I first started coming here but in these past few months, things have just gone downhill.").

children were removed from her care right before Christmas and were placed with her mother and brother. (Tr. 792-96). She was described as depressed, anxious, and angry, with psychomotor agitation, poor judgment, and poor self-concept. She was not sleeping well. She believed her medications were helping. (Tr. 795). Psychiatrist Gautam Rohatgi, D.O., also saw plaintiff on January 3rd. (Tr. 758-59). Plaintiff's mood and affect were angry; her insight and judgment were fair; she did not display psychomotor agitation or abnormal gait. Dr. Rohatgi diagnosed plaintiff with generalized anxiety disorder on Axis I and deferred diagnosis on Axis II. He continued her prescription for the antidepressant Cymbalta at 60 mg. twice a day, increased her Xanax to .5 mg twice a day, and added Doxepin for sleep. Plaintiff did not keep appointments at Comtrea on January 17th, February 9th, and February 28th. (Tr. 785-87).

Plaintiff returned to see Dr. Helton on March 2, 2012, with complaints of vomiting with motion, gastric pain, and intermittent right shoulder pain. Dr. Helton noted that plaintiff was anemic but refused to take supplements. (Tr. 799). On examination, she had tenderness in the gastric area, but no hepatomegaly or splenomegaly, and was not in apparent distress.

On March 5, 2012, Dr. Rohatgi noted that plaintiff presented with anxiety, worry, and stress arising from her legal problems. (Tr. 756-57). She was nonetheless able to perform her activities of daily living. He increased her dosage of Xanax to 1 mg. twice daily, and added 1 mg. of Haldol twice a day, and Benadryl for the side effects of the Haldol. Plaintiff's Global Assessment of Functioning (GAF) score was 60.[10]

_____

[10]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." American

Plaintiff told Ms. Eisold that the Department of Family Services (DFS) had not returned her children to her care despite her compliance with their requirements.  (Tr. 784).  She reported that she was depressed and angry, and that she cried "all the time"; Ms. Eisold noted that she was tearful throughout the session.  Plaintiff missed an appointment on April 2, 2012.  (Tr. 783).

On April 26, 2012, plaintiff told Dr. Rohatgi that she was "coping appropriately" with ongoing difficulties and had decided to allow her children to stay with her mother for the moment.  (Tr. 754).  She had stopped taking Cymbalta, because her insurance lapsed, and Haldol, because it caused nausea, and she did not want to restart either medication.  She wanted to continue only with the Xanax.  Dr. Rohatgi noted that plaintiff did not present with depression or loss of interest and was "doing well."  Her GAF score was 60.

Plaintiff went to the emergency room on June 7, 2012, with complaints of pain in her right lower leg.  (Tr. 723-29).  It was noted that she had a large mass on the outside of her right calf.  She reported that it had been present for seven years but had started causing pain in the last 3 months.  The mass also impeded her ability to fully flex her knee.  She had not sought treatment because she did not have insurance.  On examination she appeared healthy and was not in distress.  (Tr. 725).  She had full range of motion of the right leg, though she complained that full flexion "put[] tension on the swelling."  Id.  Her gait was normal.  She was prescribed Tramadol for pain.

Plaintiff saw Dr. Rohatgi on July 20, 2012.  (Tr. 752-53).  She was optimistic of a favorable outcome to her legal problems with DFS.  She stated that she was only

_____

Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

taking Xanax once or twice a day. However, Dr. Rohatgi noted that she had run out of Xanax early. He offered to prescribe an antidepressant, but she refused and requested Adderall[11] instead to help with focus and concentration. She had not seen Dr. Helton due to lack of insurance and so she was not taking Propranolol or HCZT. On examination, plaintiff was found to have euthymic affect. Although she became animated and upset when describing her legal matters, she was able to calm herself down without difficulty. Her prescription for 1 mg. of Xanax twice a day was continued. Her GAF was 50-55.

On July 30, 2012, plaintiff reported to counselor Jennifer Austin, M.A., that there had been three deaths in the family in recent months and that she had attended her brother's funeral in defiance of instructions by the Department of Family Services to stay away because her children would be present. (Tr. 777-78). Nonetheless, it was noted that plaintiff's functioning and mood had improved. On August 7, 2012, plaintiff reported an increase in depressive symptoms. (Tr. 775-76). On August 30, 2012, Ms. Austin called plaintiff and learned that her children had been returned to her care, and all was going well. (Tr. 773-74).

On December 3, 2012, plaintiff went to the emergency room for treatment of a headache that began one week earlier. (Tr. 732-740). She described the pain as intermittent and mild. (Tr. 732). A CT scan of the head was normal. (Tr. 737). Her diagnoses at discharge were headache, urinary tract infection, and anemia. (Tr. 738). She was discharged with prescriptions for iron and Percocet. (Tr. 739).

---

[11]Adderall, or Amphetamine Salt Combo, is a combination of stimulants (amphetamine and dextroamphetamine) and is used to treat attention-deficit hyperactivity disorder and narcolepsy. http://www.webmd.com/drugs/drug-63164-Adderall+XR+Oral%2F.aspx?drugid=63164 (last visited May 13, 2014) and http://www.pdrhealth.com/drugs/adderall (last visited on May 13, 2014).

Plaintiff returned to see Dr. Rohatgi on December 7, 2012. (Tr. 750-51). She reported that her children were in her care and DFS was still involved with her family. She had many financial worries. Xanax was no longer sufficient to address her anxiety and she asked to resume taking Cymbalta. Dr. Rohatgi agreed. Her diagnoses on this date were generalized anxiety disorder and adjustment disorder with depressed mood. Her GAF score was 55-60.

On January 10, 2013, plaintiff reported that she was about to lose her housing subsidy. (Tr. 769-70). She reported feeling anxious. Dr. Rohatgi noted that plaintiff was taking her Xanax "regularly throughout the day." (Tr. 748-49). She had increased worry, irritability, agitation, and restlessness, but no depression. She said she was having difficulty with focus and concentration, which she attributed to her history of attention deficit hyperactivity disorder, and for which she wanted medication. Dr. Rohatgi told her that this was not option for her and again discussed the benefits of better controlling her anxiety through medication and therapy, but she refused. He continued her prescriptions for Cymbalta and Xanax at the same levels. Her GAF was 60.

Plaintiff saw Dr. Helton on February 13, 2013. (Tr. 797-98). She reported that she had required emergency care for a migraine. She had not taken her blood pressure medication for almost a year because she could not afford it. She reported that standing increased the pain in the tumor on her right leg to 10 on a 10-point scale. She was not taking pain medication, however. She had gained more than 30 pounds, and Dr. Helton agreed to prescribe Adipex for 3 months in exchange for her agreement to walk three miles every day and diet. Plaintiff requested a handicap placard, but he found she did not qualify. He prescribed Propranol and Adipex.

On March 1, 2013, Dr. Rohatgi noted that plaintiff had many new stressors, including husband's attempt to gain custody of her children, involvement with DFS, and her oldest daughter's pregnancy. (Tr. 746-47). She reported anxiety and difficulty sleeping and requested an increase in Xanax. Dr. Rohatgi offered different medications, including those for sleep, but she refused. She was continued on her current dosages of Xanax and Cymbalta. She was directed to complete the paperwork for prescription assistance programs.

## B. **February 6, 2013 Hearing Testimony**

At the time of the hearing, plaintiff resided with her six children, ages 7 through 17. (Tr. 470-71). She was separated from her husband, who was on disability and did not provide any child support. Two of her children received disability. Plaintiff testified that she had received special education services for learning disabilities as a child. (Tr. 484). She left school at age 16 when she completed eighth grade. (Tr. 485).

Plaintiff participated in court-ordered individual and family counseling. (Tr. 473). She had been diagnosed with depression and anxiety for which she was taking Xanax and Cymbalta. The medications reduced the frequency of her crying spells from several in a day to one or two a week. (Tr. 488). She also experienced daily episodes of anxiety during which she felt claustrophobic and unable to breathe. (Tr. 491-92). Xanax helped to control these symptoms.

Plaintiff testified that she had neurofibromatosis, as did her mother, one of her children, and a younger brother who had died following surgery to remove a tumor. (Tr. 475-76, 482). Plaintiff testified that she had tumors on her brain that periodically filled with fluid, causing headaches and reduced hearing. (Tr. 475). Her headaches typically lasted for two or three days and could occur four or five times each month.

(Tr. 456).  She also had a softball-sized tumor on her leg, which swelled with activity and turned black and blue.  (Tr. 479).  The tumor caused her to stumble several times a day.  (Tr. 477).  Sometimes she had pain shooting into her toes.  She typically spent half of each day in a recliner with her leg propped on a pillow.  She was told the tumor was entwined in her muscles and ligaments and could not be removed.  (Tr. 476).  Plaintiff also testified that she had limited rotation of her right shoulder.  (Tr. 481).

Plaintiff testified that, four or five times a month, she had headaches that lasted two to three days at a time.  (Tr. 456).  Her headaches "just come . . . out of nowhere."  (Tr. 469).  During headaches, she was unable to concentrate and had to remain in a cool dark place.  (Tr. 473).  Topamax did not control the pain, and she was allergic to Imitrex. (Tr. 456, 469).  Other medications were too expensive and she had been unable to obtain financial assistance for other medications.  (Tr. 470).  Similarly, she could not afford to see a specialist for her neurofibromatosis.

Plaintiff testified that she tried to eat three meals a day, but her headaches often caused nausea.  (Tr. 490).  She bathed about twice a week, when she was able to get her oldest daughter's help.  Her daughter also helped her to dress.

Plaintiff testified that she had never held a full-time job because she had suffered with neurofibromatosis and headaches since she was a small child.  When asked how she took care of her children, she stated that her oldest child helped with the younger children, and her husband had helped before their separation.  (Tr. 474).  When the children were very young, her husband worked and the family paid someone to help her on days when she had headaches.  (Tr. 475).

The ALJ heard testimony from Ann Winkler, M.D., Ph.D., who is board certified in internal medicine and rheumatology.  (Tr. 454; 589).  Based on a review of plaintiff's

medical records, Dr. Winkler testified that plaintiff's medically determinable impairments included the nonsevere impairments of mild splenomegaly; decreased vision; hypertension; neurofibromatosis; and a single episode of weakness on her right side. Her severe impairments included headaches which were not adequately treated; a painful mass on her right leg; and morbid obesity. (Tr. 455-58). These impairments did not meet or equal a listing. Based on the limited information available, Dr. Winkler opined that plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently, stand or walk 6 hours out of 8, and sit without limitation. (Tr. 460). Dr. Winkler found that plaintiff had no postural limitations, but should avoid unprotected heights. Dr. Winkler opined that headaches can cause absences or diminish a person's capacity to stay focused. (Tr. 461-62).

Counsel asked Dr. Winkler about plaintiff's treatment for issues with her shoulder and arm. Dr. Winkler noted that plaintiff was treated for a broken rib in 2007, but did not require follow-up. In September 2011, it was noted that plaintiff had "light right upper . . . arm drift," which Dr. Winkler explained usually has to do with weakness. (Tr. 463-64). However, in December 2012, there were no complaints of weakness and thus the issue appeared to have resolved.

In response to questions from counsel, Dr. Winkler testified that Imitrex is usually prescribed for migraine headache. (Tr. 462-63). Other medications in the same classification are available for patients who are allergic to Imitrex, as plaintiff alleged. Dr. Winkler noted that plaintiff had one medication trial but there was no follow-up. (Tr. 466). Dr. Winkler agreed that some migraine sufferers do not respond to medication. (Tr. 465). However, under that circumstance, one would expect to find multiple trials of different medications, which had not occurred here. She would also

expect to see advice to avoid caffeine, eat regular meals, exercise, and avoid smoking, which she also did not see.

With respect to plaintiff's neurofibromatosis, Dr. Winkler testified that the condition's severity depends upon the location and size of the fibromas. Dr. Winkler noted that Dr. London's report did not mention neurofibromatosis. (Tr. 466-67).

Dolores E. Gonzalez, M. Ed., a vocational expert, testified about the employment opportunities for a younger individual, with limited education, and no past relevant work experience, who was limited to performing work at the medium exertion level, who could occasionally climb ropes, ladders, scaffolds, stairs and ramps; could frequently stoop, kneel, crouch, crawl, and balance; and should avoid exposure to hazards and unprotected heights. In addition, the individual was restricted to routine repetitive tasks, that required only occasional judgment, decision-making, and changes in the work setting. (Tr. 497-98). Such an individual would be able to perform work as a dining room attendant or a hand packager. If the individual were restricted to performing light exertional work, she would be able to perform work as a mail sorter and a marker; and if restricted to sedentary exertional level, could work as a table worker or a document preparer. If the same individual were likely to be absent two days a month or be off task 20 percent of the time, she would be precluded from employment. (Tr. 499).

## IV.  The ALJ's Decision

In the decision issued on October 10, 2013, the ALJ made the following findings:

1.     Plaintiff has not engaged in substantial gainful activity since March 10, 2008, the application date.

2.     Plaintiff has the following severe impairments: mild splenomegaly, headaches, right leg mass, morbid obesity, depression, and anxiety.

3.  Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  Plaintiff has the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.967(c). She can occasionally climb ladders and stairs, and is able to frequently stoop, kneel, crouch, crawl and balance. She is limited to routine, repetitive tasks in an environment that has occasional changes in the work setting and requires occasional decision making.

5.  Plaintiff has no past relevant work.

6.  Plaintiff was born on October 9, 1975, and is a younger individual. 20 C.F.R. 416.963(c) ("younger" individual is under age 50).

7.  Plaintiff has limited education and is able to communicate in English.

8.  Transferability of job skills is not an issue because plaintiff does not have past relevant work.

9.  Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.

10. Plaintiff has not been under a disability within the meaning of the Social Security Act since March 10, 2008, the date the application was filed.

(Tr. 14-22).

## V.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions

represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184,

*2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she

cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## VI.  Discussion

Plaintiff argues that the ALJ's Residual Functional Capacity (RFC) determination is not supported by medical evidence.  She further argues that the hypotheticals posed to the vocational expert were improper.

### A.  Residual Functional Capacity

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations."  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted).  "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  Id. (citation omitted).  The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant."  Id.

Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

Dr. Winkler testified at the hearing that headaches might cause absences from work or loss of concentration. (Tr. 461-62). Plaintiff argues that, because the ALJ gave significant weight to Dr. Winkler's opinion (Tr. 438), the ALJ was obliged to find that plaintiff's headaches would cause frequent absences and loss of concentration in formulating plaintiff's RFC. This argument fails to address the ALJ's determination that plaintiff's headaches were not as limiting as she alleged.[12] (Tr. 437). First, the ALJ noted that plaintiff required emergency treatment for headaches of unknown origin[13] relatively infrequently. (Tr. 437) (noting emergency treatment in July 2007, April 2008, September 2010, September 2011, and December 2012). On those occasions, objective medical tests failed to disclose any abnormality, (Tr. 369, 636, 714, 737), and her headaches responded to treatment. (Tr. 299, 636, 669, 661, 715); see also Tr. 668 (plaintiff told urgent care staff that her headaches usually responded to Vicodin). Furthermore, plaintiff did not have regular medical care between April 2008 and April 2011. Thus, substantial evidence in the record supports a determination that

---

[12]The court has reviewed the ALJ's credibility determination, which plaintiff does not challenge, and finds that it is supported by substantial evidence.

[13]A headache in January 2010 was attributed to sinusitis. (Tr. 687-88).

plaintiff's headaches would not cause loss of focus or excessive absences.  Plaintiff's challenge to the RFC determination is without merit.

**B.  The Hypothetical Submitted to the Vocational Expert**

Plaintiff argues that the hypothetical submitted to the vocational expert did not accurately reflect her impairments and thus the ALJ should not have relied on her testimony.  A hypothetical is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ.  Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  The Court has determined that the ALJ's RFC determination is supported by substantial evidence and thus rejects plaintiff's challenge to the hypothetical.

**VII.  Conclusion**

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of February, 2015.